UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------- x

SHELLY CARTER and ROSEMARIE CATALDO, :
                                      :
                    Plaintiffs,       :
                                      :        **MEMORANDUM &**
        -against-                     :        **ORDER**
                                      :
CITY OF HARTFORD,                     :        3:22-CV-00298 (VDO)
                                      :
                    Defendant.        :
---------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

      Plaintiffs, Shelly Carter ("Carter") and Rosemarie Cataldo ("Cataldo") brought this action against Defendant, the City of Hartford ("the City") under 42 U.S.C. §§ 2000e *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), and Conn. Gen. Stat. § 46a-60, the Connecticut Fair Employment Practices Act ("CFEPA"). Plaintiffs allege that during the course of their employment at the Hartford Fire Department ("HFD"), they were subjected to discrimination on the basis of their sex and race. Specifically, Carter claims (1) discrimination in violation of CFEPA, (2) discrimination in violation of Title VII, (3) retaliation in violation of Title VII, (4) retaliation in violation of CFEPA, (5) constructive discharge as a result of a hostile workplace environment, and Cataldo claims (6) discrimination in violation of CFEPA, (7) discrimination in violation of Title VII, (8) retaliation in violation Title VII, (9) retaliation in violation of CFEPA. (Compl., ECF No. 1 ¶¶ 54–81.) The City moves for summary judgment on all counts.

I.    **BACKGROUND**

A.    **Factual Background**

The following facts are taken from the City's Local Rule 56(a)1 Statement of Undisputed Material Facts as to Carter ("Def.'s Carter 56(a)," ECF No. 56-2), Carter's Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment ("Carter's 56(a)," ECF No. 61), the City's Local Rule 56(a) Statement of Undisputed Material Facts as to Cataldo ("Def.'s Cataldo 56(a)," ECF No. 57-2), Cataldo's Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment ("Cataldo's 56(a)," ECF No. 65), the Complaint, and the record. The facts are recounted "in the light most favorable to" Plaintiffs, the non-movant. *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 354 (2d Cir. 2021). The facts as described below are in dispute only to the extent indicated.

1.    **Facts as to Carter**

Carter, an African American woman and Connecticut resident, began working for the HFD in 1999. (Compl. ¶ 6; Carter's 56(a) ¶ 1.) The HFD first hired Carter to the position of structural firefighter, later promoting her to a driver position in 2013 and Lieutenant in 2015. (Carter's 56(a) ¶¶ 1–3.) In 2019, Carter was promoted to the rank of Captain and remained in that position until 2021. (*Id.* ¶¶ 16, 47.) In her twenty-one years with the HFD, Carter received numerous certifications as a firefighter and officer and broke ground for the advancement of women and people of color in firefighting in the state of Connecticut. (Compl. ¶ 8.)

Prior to becoming Lieutenant, Carter underwent thirteen weeks of training for fire code inspections and fire investigations to become certified. (Carter's 56(a) ¶ 4.) After successfully completing the training, Carter began working in the Fire Marshal's Office. (*Id.* ¶ 7.) In her role as Lieutenant, Carter did not have any supervisory responsibilities. (*Id.* ¶ 8.)

At the start of Carter's assignment within the Fire Marshal's Office, the acting Fire Marshal was Roger Martin, with whom Carter had a positive relationship. (*Id.* ¶¶ 9–10.) After Martin's departure from the position, Ewan Sheriff, a Black male, assumed the role of Fire Marshal and acted as Carter's "boss." (Carter's 56(a) ¶ 9.) Neither party disputes that Carter's relationship with Sheriff was "tumultuous." (Carter's 56(a) ¶ 11.) Sheriff made numerous requests for Carter to be disciplined, eventually leading Chief Costello to request that he stop. (Carter's 56(a) ¶ 11.) When asked why the relationship was "tumultuous" Carter testified:

> He was very degrading. Even when I was right, he just spent a lot of time just putting me down and then writing me up to go to the chief's office for discipline. That happened multiple times, so much so that Assistant Chief Costello said, ["]Stop writing her up,["] because all of them were frivolous.

(Carter's Dep., ECF No. 56-3 at 81:25–82:5.)

Carter was never formally disciplined as a result of these complaints. (Carter's 56(a) ¶ 12.) On April 11, 2019, Carter, accompanied by another firefighter, visited the City's human resources department to make a verbal complaint regarding the perceived differential treatment she received due to her gender. (*Id.* ¶ 13.) The City conducted an investigation of Carter's hostile workplace complaint and concluded that it was unfounded. (Carter's 56(a) ¶¶ 14–15; ECF No. 56-6; Carter's Dep. at 163:17–25.)

In May of 2019, the HFD promoted Carter to Captain. (Carter's 56(a) ¶ 16.) At the time of her promotion, there were no open line positions. (*Id.* ¶ 17.) Chief Barco offered her an executive officer position, a role held by a captain, while Carter waited for a line position to become available. (*Id.*) In August of 2019, Carter moved to the line and was assigned to Station 5. (*Id.* ¶ 19.) Initially Carter had no issues with Chiefs Tulier and Tenney, who were overseeing her tour. (*Id.* ¶ 21–22.) However, according to Carter, that changed in December 2019 and

January 2020, after Carter was denied an opportunity to ride in the red car, which signifies that an individual is acting in the position of Deputy Chief, while a male captain, Talit, was allowed to join. (*Id.* ¶¶ 23, 26–27; Carter's Dep. at 191:11–192:2.) While Carter and Talit were both promoted that May, Talit's ninety-day probationary period began in May whereas Carter's started in August of that year. (Carter's 56(a) ¶¶ 23, 26–27.) Carter testified that she was watched constantly by the chiefs but was unsure whether the chiefs watched other people to a similar degree. (*Id.* ¶ 24.)

On January 15, 2020, Tulier requested training for Carter to develop operational decision-making experience for the suppression division, as she had not been on the line for several years and needed more command experience. (Def.'s 56(a) ¶ 25; ECF No 56-7.) A meeting was convened with Carter, her union president, Tulier, Tenney, and Barco during which her performance and lack of experience were reviewed. (Carter's 56(a) ¶ 30.) Barco confirmed that Carter would be assigned to training. (*Id.*) In a later email clarifying his decision, Barco outlined several concerns discussed during the meeting, including Carter's lack of knowledge on shutting off gas at a residential property, her inability to silence a fire alarm panel despite serving as a lieutenant, and her decision to wear a high-visibility traffic vest under her self-contained breathing apparatus. (Carter's 56(a) ¶ 26(b); ECF No. 61-3.) On February 10, 2020, the union and management entered into a formal agreement, which stated:

> 1. Captain Shelly Carter shall be detailed to the Training Division commencing February 10, 2020[,] for a minimum of one (1) Month or until satisfactorily completing Blue Card and its components along with the Officer Training program as outlined by the training division.
>
> 2. After completion of Blue Card and as part of the outlined officer training Captain Carter will then be assigned by the Tour Commander to shadow the on-duty Deputy Fire Chief (Tour Commander) or on duty District Fire Chief for the

purpose of training and familiarization with the duties and responsibilities required of a District Fire Chief . . . .

(Carter's 56(a) ¶ 32; ECF No. 56-8 at 2.)

Requiring completion of Blue Card training, a standardized program for command and control, was not highly unusual, as multiple officers had undergone this training and between four to six other individuals attended the training alongside Carter, nor was it considered a disciplinary measure under the union contract. (Carter's 56(a) ¶¶ 34, 38–39, 50.) The training contains both a classroom component, requiring passing scores in quizzes to advance to the next level, and a simulator portion. (*Id.* ¶ 34.) After failing some of the classroom sections, Carter was required to retake those sections until she passed, which extended the time to complete the training. (*Id.* ¶ 35.) In addition, Carter failed the simulator portion of the Blue Card training on at least her first attempt. (*Id.* ¶ 36.) It took over six months for Carter to complete the training. (Compl. ¶ 35.)

Following her completion of the training, she was assigned to Station 10 and allowed to ride in the red car. (Carter's 56(a) ¶ 42.) According to Carter, after returning from training, she was subjected to such intense scrutiny, ostracization, isolation, and hostility that she was forced to retire after serving for twenty-one years and nine months. (Compl. ¶ 42.) Her retirement became effective on April 24, 2021. (Carter's 56(a) ¶ 47.) At the time of her retirement, Carter was the only female captain in the HFD. (Answer ¶ 15.)

### 2.    Facts as to Cataldo

Cataldo, a woman and Connecticut resident, began working for the HFD in 2012. (Cataldo's 56(a) ¶ 1; Compl. ¶¶ 1–2.) Following her graduation from the academy, Cataldo was assigned to Engine 10 for several years before being transferred to Engine 1. (Cataldo's

56(a) ¶¶ 2, 4.) By all accounts, Cataldo had positive relationships with both her Engine 10 and Engine 1 crews. (*Id.* ¶¶ 3, 6.)

In 2017, Cataldo's troubles began when she was promoted to driver and reassigned back to Engine 10.[1] (*Id.* ¶¶ 8–13; Cataldo's Dep., ECF No. 57-3 at 23:2–3.) Although she had a good relationship with the Engine 10 crew, she clashed with Lieutenant Handzlick, who told Cataldo on her first day that he did not want a female driving him. (Cataldo's 56(a) ¶ 9.) According to Cataldo, the relationship between her and Handzlick did not improve, constituting "consistent, constant harassment," during which he constantly screamed and yelled at her. (*Id.* ¶ 11(b).)

Evidently, word of Handzlick's actions spread throughout the HFD because District Chief Guertin pulled Cataldo aside and asked whether she could continue working with Handzlick, to which Cataldo responded, "If things improve, yes." (*Id.* ¶ 13; Cataldo's Dep. at 30–32.) Following this conversation, Handzlick's behavior temporarily improved, but before long the situation degenerated and Handzlick reverted to shouting at Cataldo and making caustic comments about women drivers. (Cataldo's 56(a) ¶ 14.)

Eventually, less than a year after her promotion, Cataldo called the union and reached out to Chief Cucuta about the harassment. (*Id.* ¶¶ 17–18.) According to Cataldo, Cucuta asked if she wanted to report Handzlick to human resources but advised her that the lieutenant test was approaching and he hoped she was focused on that. (*Id.* ¶ 17.) Rather than report Handzlick's behavior to human resources, Cataldo spoke with Chiefs York and Guertin and

---

[1] Although the parties' 56(a) statements allege that Cataldo was reassigned from Engine 1 to Engine 1, Cataldo's deposition clarifies that she was transferred from Engine 1 to Engine 10.

told them that she could no longer work with Handzlick. (*Id.* ¶ 17.) Although Cataldo thought Handzlick would be transferred, Cataldo was instead transferred to the chief's office in a role that involved answering phones and folding laundry. (*Id.* ¶ 17.)

After a couple months in the chief's office, Cataldo was transferred to Engine 9, and on December 2, 2018, Cataldo was promoted to Lieutenant at the training academy division. (*Id.* ¶ 21) Although Cataldo had a good relationship with the other lieutenants assigned to the division, her relationship with her superior, Chief Erickson, was strained. (*Id.* ¶¶ 22, 26.) Cataldo was again promoted in June 2019 to Lieutenant on the line, and after two weeks of required training, she was assigned to Engine 15, where she remained for the following three years. (*Id.* ¶¶ 24–25.) During her time at Engine 15, Cataldo repeatedly requested to attend FEMA Urban Search & Rescue trainings but was denied whereas male members were permitted. (*Id.* ¶¶ 93–97.)

On January 17, 2020, Cataldo filed a grievance against Chief Freeman alleging that he was aware that she was being discriminated against and harassed by Guertin in violation of the union contract. (*Id.* ¶ 31.) On January 29, 2020, a human resources analyst met with Cataldo to discuss her concerns in light of the City's policy against discrimination and harassment. (*Id.* ¶ 32.) The City retained Attorney Cindy Cieslak to conduct an investigation. (*Id.* ¶ 34.) Cieslak interviewed Cataldo, conducted an investigation, and concluded that Cataldo had not been subjected to an adverse employment action and that the reported conduct was not sufficiently severe or pervasive so as to alter the terms and conditions of her employment. (*Id.* ¶¶ 35–38.)

In the summer of 2021, Cataldo was transferred to Engine 10 as a Lieutenant, where she had a positive relationship with the entire crew. (*Id.* ¶¶ 39–41.) While at Engine 10, Cataldo had no issues with Guertin. (*Id.* ¶ 43.)

Cataldo was promoted for a final time in June 2023 to Captain. (*Id.* ¶ 98.) However, according to Cataldo, the HFD withheld her promotion for two weeks because another male who was also being promoted complained to the chiefs and the unions that he did not want Cataldo's time and grade for the promotion to start before his. (*Id.* ¶ 98.)

### B.    Procedural History

On December 2, 2020, Carter filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") claiming discrimination on the basis of her race and sex, retaliation, and harassment. (Carter's 56(a) ¶ 46; ECF No. 56-9.) On October 7, 2021, Cataldo filed a complaint with the CHRO alleging discrimination on the basis of sex and harassment. (Cataldo's 56(a) ¶ 45; ECF No. 57-5.) Plaintiffs filed the instant action on February 24, 2022, claiming discrimination, hostile workplace environment, and retaliation, as well as constructive discharge as to Carter. (Compl. ¶¶ 54–81.) The City moved for summary judgment as to all of Plaintiffs' claims. (ECF No. 56.)

## II.    LEGAL STANDARD

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disagreements concerning immaterial or minor facts thus cannot preclude summary judgment. *See Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir.1990). A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a

verdict for the non-moving party. *Anderson*, 477 U.S. at 248. The court's role, therefore, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022). Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

The initial burden rests on the moving party to establish the absence of any genuine issue of material fact. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once the movant brings forth an absence of such issues, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). To survive a motion for summary judgment, the nonmovant, "must do more than simply show that there is some metaphysical doubt as to the material facts [or] rely on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). The mere existence of "a scintilla of evidence" in support of the nonmovant's position is insufficient; there must be enough evidence on which the jury reasonably could rule for it. *Stapleton v. Barrett Crane Design & Eng'g,* 725 F. App'x 28, 30 (2d Cir. 2018).

## III.    DISCUSSION

### A.    Timeliness

Plaintiffs allege that the City violated Title VII and CFEPA by discriminating against them on the basis of their sex,[2] creating a hostile work environment, and retaliating against

---

[2] Carter also asserts that Defendant also discriminated against her on the basis of race, in violation of the CFEPA and Title VII. (Compl. ¶¶ 4, 55, 58). Carter, however, has failed to produce direct or circumstantial evidence to support claims of racial animus, and her arguments contained in her

them. (Compl. ¶¶ 54–81.) The City rebuts that most, if not all, Plaintiffs' claims pursuant to Title VII and CFEPA are time barred. (Def.'s Carter Mem., ECF No. 56-1 at 8–10; Def.'s Cataldo Mem., ECF No. 57-1 at 7–9.) Plaintiffs respond that their claims survive under the continuing violation doctrine. (Carter's Mem., ECF No. 67 at 2–4; Cataldo's Mem, ECF No. 66, at 2–4) Having considered the factual record, the Court concludes that the continuing violation doctrine applies to Carter's hostile work environment claims, but that Carter's disparate treatment claim pursuant to CFEPA and all of Cataldo's claims pursuant to Title VII and CFEPA are time barred.

A plaintiff bringing an employment discrimination claim under Title VII must exhaust all available administrative remedies through the EEOC or CHRO. *Soules v. Connecticut*, 882 F.3d 52, 57 (2d Cir. 2018). A plaintiff who seeks to pursue a claim of discrimination under Conn. Gen. Stat. §46a-60, occurring on or after October 1, 2019, and prior to October 1, 2021, must file a claim with the CHRO "not later than three hundred days after the date of the alleged act of discrimination." Conn. Gen. Stat. 46a-82(f)(1); *see Spisak v. Trader Joe's E., Inc.*, No. 3:22-CV-6120122-S, 2023 WL 6120645, at *4 (Conn. Super. Ct. Sept. 13, 2023). Under Title VII, the same 300-day limitation period applies, provided that the plaintiff has filed a charge

---

opposition to summary judgment rest solely on being treated differently than similarly situated *male* counterparts. (Carter Mem. at 7–8). Carter made one comment during testimony alluding to being treated differently because she was a Black woman, specifically her statement that, "this is all speculation – if I was a white woman, I don't think I would have had that difficulty because there were other white female captains who rode the red car . . . ." (Carter's Dep. at 209:9–12.) Within that same testimony, Plaintiff cannot recall a single instance of racially discriminatory comments. (Carter's Dep. at 200:7–11.) As the record lacks sufficient evidence to establish a prima facie case or support a rational jury finding in Plaintiff's favor, summary judgment is appropriate for the Title VII racial discrimination claims.

of discrimination with a state agency. *Bispham v. Hartford Hosp.*, No. 14-CV-1126, 2016 WL 5348566, at \*7 (D. Conn. Sept. 23, 2016).

The continuing violation doctrine "applies to claims composed of a series of separate acts that collectively constitute one unlawful practice." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (cleaned up). Therefore, the statute of limitations will be delayed "until the last discriminatory act in furtherance of" an ongoing practice or policy of discrimination. *Tassy v. Buttigieg*, 51 F.4th 521, 532 (2d Cir. 2022). A court may therefore consider untimely acts, "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002)). If a continuing violation may be found, liability can be determined by considering "all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996)).

### 1.    Carter's CFEPA and Title VII Claims

The record reflects that Carter filed her complaint with the CHRO on December 2, 2020. (Carter's 56(a) ¶ 46). The City argues that any alleged acts of discrimination that occurred prior to June 5, 2020, including Carter's detail to training, are time-barred under the CFEPA, and any alleged acts of discrimination that occurred prior to February 6, 2020, are time-barred under Title VII. (Def.'s Carter Mem. at 10.) Carter responds that claims outside the statutory time-period can be considered for the purposes of determining liability under the "continuing violation" doctrine. (Carter's Mem. at 3.)

While Carter has stated that there is "ample evidence within the record of discriminatory acts" which occurred after June 5, 2020, and February 6, 2020, Carter has not provided specific dates or allegations to support such a claim. (*Id.*) As her training began in February 2020, it is timely for the purposes of Carter's Title VII claims. Further, as the training continued for over six months, presumably any alleged act contributing to a hostile workplace which transpired after her return from training is timely under the CFEPA. Carter alleges that following her return from training while operating outside her crew at Engine Ten, the other officers and firefighters would ignore what she told them to do. (Carter's 56(a) ¶ 62.) On one occasion Lieutenant Googs and his crew ignored Carter's repeated requests to bring tools to respond to a car that was on fire. (Carter's 56(a) ¶ 65.) And at that same scene, Deputy Chief Driscoll began yelling at Carter in front of approximately ten other firefighters, screaming, "learn your f-ing job." (*Id.* ¶ 67.) Because this incident is alleged to have taken place within the statutory period, "all prior acts related to Plaintiff's hostile work environment claim are appropriately considered." *Mallison v. Conn. Off. Early Childhood*, 634 F. Supp. 3d 21, 33 (D. Conn. 2022).

While the assignment to training can extend the statute of limitations for untimely acts under the continuing violation doctrine, the Second Circuit has consistently held that a timely hostile environment claim cannot make an untimely discrete act actionable. *See King v. Aramark Servs. Inc.*, 96 F.4th 546, 560 (2d Cir. 2024). The *Morgan* Court has identified discreet discriminatory acts as including "termination, failure to promote, denial of transfer, [and] refusal to hire," and explained that they are "not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113–14. Thus, Carter's claim of disparate treatment under CFEPA is dismissed, as her assignment to training

cannot be separately actionable as it constitutes a discrete act. However, even if discrete acts outside the statute of limitations are not actionable, an employee may still use prior acts as background evidence for a timely claim. *Davis-Garett*, 921 F.3d at 42.

In summary, acts contributing to a hostile or retaliatory environment may be properly considered under continuing violation doctrine. However, Carter's assignment to training constitutes a discrete act, thereby rendering her CFEPA discrimination and retaliation claims time-barred.

### 2.    Cataldo's CFEPA and Title VII Claims

The record shows that Cataldo filed her complaint with the CHRO on October 7, 2021. (Cataldo's 56(a) ¶ 45). Defendant argues that any alleged acts of discrimination that occurred prior to April 10, 2021, are time-barred under the CFEPA, and any alleged acts of discrimination that occurred prior to December 11, 2020, are time-barred under Title VII. (Def.'s Cataldo Mem. at 9.) Cataldo responds that claims outside the statutory time-period can be considered for the purposes of determining liability under the "continuing violation" doctrine. (Cataldo's Mem. at 4.) However, Cataldo has failed to point to any acts of discrimination that occurred within the statutory time-period.

Cataldo points to two incidents that she believes constitute continuing violations. First, she indicates that when she was at Engine 15 in approximately 2019–2022, she was repeatedly denied the opportunity to attend trainings whereas her male counterparts were permitted. (Cataldo's Mem. at 8.) However, Plaintiff fails to establish that these incidents took place after December 11, 2020. To the contrary, her testimony establishes that these incidents took place *prior* to the COVID shutdowns at the beginning of 2020. (ECF No. 65-2 at 155:15–155:17.)

Second, Cataldo alleges that her promotion to captain was delayed because her male counterpart did not want her promotion to take effect before his took place in 2023—within the statutory period. (Cataldo's Mem. at 8.) Cataldo has not presented any evidence to enable a reasonable factfinder to infer that this was an act of discrimination. Indeed, Cataldo's testimony indicates that she was treated no differently from her counterparts, but rather that she was treated equally with them. Specifically, Cataldo indicated that there are two types of captains: training captains and line captains. (ECF No. 65-2 at 145–47.) Cataldo was ranked first to become a training captain. On the day she was sworn-in as a training captain, three others were to be sworn in as line captains. (*Id.*) However, due to an administrative mix-up, the line captains were not sworn in. (*Id.*) Three days after being sworn in, she inquired as to why she was not starting her shift as a captain and was told that the person who was ranked first to become a line captain requested that they all be promoted at the same time. (*Id.*) Cataldo, herself, explains that this decision was not based on sex, but on "time in grade" and that had she been promoted before the others, she would have been eligible for other promotions before them, rather than at the same time. (*Id.* at 148–49.) Not once throughout her testimony did she cite her sex as the reason for her delayed promotion. (*Id.* at 145–50.) Rather, she testified that she was treated with parity to her peers.

Cataldo, therefore, fails to proffer any evidence of an act of discrimination within the statutory time period. Accordingly, Cataldo's claims are dismissed.

### B.    Carter's Claim of Disparate Treatment Discrimination under Title VII

Under Title VII it is unlawful for an employer to discriminate against an individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's sex. *See* 42 U.S.C. § 2000e-2; Conn. Gen. Stat. § 46a-60(b)(1). Discrimination

claims asserted under Title VII and CFEPA are analyzed under the burden-shifting framework described in *McDonnell Douglas Corp.* v. Green, 411 U.S. 792, 802–04 (1973). *See Bentley v. AutoZoners*, LLC, 935 F.3d 76, 88 (2d Cir. 2019) (applying the same analysis for parallel claims under Title VII and CFEPA). Defendant contends that Carter fails to establish a prima facie case of discrimination under both the CFEPA and Title VII. (Def.'s Carter Mem. at 10–14.) Having considered the record, the Court concludes that there are triable issues of material fact as to Carter's disparate treatment claim under Title VII.

To establish a prima facie case of disparate treatment, Carter must establish (1) that she belonged to a protected class; (2) that she was qualified for the position she held; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Banks*, 81 F.4th at 270 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). Once the plaintiff has established a prima facie case, the burden shifts to the employer to provide a "legitimate, nondiscriminatory reason" for its adverse action. Upon that showing, the burden then shifts back to the plaintiff to prove that reason proffered by the employer is pretextual and the adverse decision "was in fact pretext for discrimination." *Banks*, 81 F.4th at 270. A plaintiff can satisfy this burden by reference on the same evidence used to establish a prima facie case, so long as the evidence allows for plausible inferences of pretext. *Bentley*, 935 F.3d at 89.

## 1.  Adverse Employment Action

Defendant first contends that Carter has failed to establish a prima facie case of discrimination because her assignment to training does not constitute an adverse employment action. (Def.'s Mem. at 13.) The Court, viewing the record in the light most favorable to the

plaintiff, finds that an assignment to training qualifies as an adverse employment action for the purposes of establishing a prima facie case.

The Second Circuit has long required that to qualify as an adverse employment action, changes to terms and conditions of employment must be materially adverse. *See Weeks v. New York State*, 273 F.3d 76, 85 (2nd Cir. 2001); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015). However, in deciding *Muldrow* the Supreme Court "change[d] the legal standard used in any circuit that has previously required 'significant,' 'material,' or 'serious' injury." *Muldrow v. City of St. Louis*, 601 U.S. 346, 356 n.2, (2024).[3] As a result, the material harm standard has been replaced by a showing of "*some harm* respecting an identifiable term or condition of employment." *Id.* at 355 (emphasis added). Furthermore, the Supreme Court articulated that "[t]erms or conditions" in an employment discrimination claim cover more than the "economic or tangible" factors and applies beyond a "narrow contractual sense." *Id.* at 354.

Given this lower burden, a reasonable jury could find that the assignment was sufficiently disadvantageous to qualify as an adverse employment action. Plaintiff claims that this training resulted in financial harm, as the training impacted her ability to earn overtime pay and reduced the amount of pay she could receive once promoted. (Carter's 56(a) ¶ 52; ECF No. 61-1 at 12–13.) Additionally, Plaintiff claims that the training negatively impacted intangible aspects of her employment by damaging her reputation, undermining her respect

---

[3] The Court notes that the City fails to cite *Muldrow*, despite it being controlling case law. The Court reminds Defendant's counsel of their obligation to not knowingly "fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel," Model Rule of Pro. Conduct r. 3.3, as well as their duty to "act with reasonable diligence," Model Rule of Pro. Conduct r. 1.3.

among colleagues and subordinates, and limiting her opportunities for career development. (Carter's 56(a) ¶ 52; ECF No. 61-1 at 14.) Given that the Court finds that the Carter has met her burden under the second prong, it will now turn its attention to whether the plaintiff has created a triable issue as to whether the circumstances give rise to an inference of discrimination.

### 2.    Giving Rise to Inference of Discrimination

A plaintiff may satisfy the fourth element of her prima facie case by demonstrating that she was treated "less favorably than a similarly situated employee outside [her] protected group." *Mandell v. Cnty. Suffolk*, 316 F.3d 368, 379 (2d Cir.2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)) While a plaintiff need not identify an identical comparator, "the individuals with whom [the] plaintiff attempts to compare herself must be similarly situated in all material respects." *Doe v. City of N.Y.*, 473 F. App'x 24, 27 (2d Cir. 2012). A determination of whether an individual is similar in "all material respects" to the plaintiff requires a case-by-case evaluation as to "(1) whether the plaintiff and those [s]he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022) (quoting *Graham*, 230 F.3d at 40).

Furthermore, a plaintiff is not limited to the use of a comparator to satisfy the fourth prong; an inference of discrimination can arise from "the employer's criticism of the plaintiff's performance in ethnically degrading terms[,] or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of N.Y.*,

795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).

Carter points to several instances in which she received less favorable treatment than males, thereby creating a triable issue of fact. At the time of the promotion, Carter requested to receive New Officer Captain two-week training with the other new, male officers, which was standard practice for all new captains; however, Chief Reilly denied her request to be included in the full 2-week training that other officers routinely received and told her, "[I]f [you] didn't know [your] job as a captain, then maybe [you] shouldn't have the position." (ECF No. 61-1 at 2.) Carter also testified that Tenney informed her she would be assigned to ride in the red car, but without explanation, the assignment went to a similarly situated male. (Carter's Dep. at 106:9–107:20, 113:9–20.) The City asserts that Talit, the man who was chosen, is not materially similar, given that he began his probationary period three months prior to Carter. (Def.'s Reply Mem., ECF No. 71 at 5.) However, this explanation does not refute the fact that the next opportunity promised to Carter was also given to a male, with the justification being that Carter was assumed to be absent that day. (Carter's Dep. at 106:9–107:20.)

Carter also identified two male deputies by name, who, once promoted to line deputy chiefs, were afforded opportunities to do ride-alongs and receive training; Carter claims that she was not afforded these opportunities. (ECF No. 61-1 at 13–14). A rational finder of fact could infer a discriminatory motive in denying Carter the training provided to other males and bypassing her for opportunities that were promised to her.

Additionally, a plaintiff can also allege a "mosaic of intentional discrimination by identifying bits and pieces of evidence that together give rise to an inference of discrimination." *Vega*, 801 F.3d at 87 (internal quotation marks omitted). Along with these

allegations, Carter has identified other "bits and pieces of evidence"— the internal complaints of sex-based hostility and discrimination filed by Arvah Quinones, Felecia Graves, Candia Baptist, and Rose Marie Cataldo (ECF No. 61-1 at 6–7), the fact that training was seldom, if ever, assigned to other Captains; (ECF No. 56-3 at 38:13–20); and the heightened scrutiny and general hostility Carter faced. Plaintiff has therefore met her prima facie burden and summary judgment is improper on this ground.

### 3.    Pretext

Once the plaintiff has established a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its adverse action. *Vega*, 801 F.3d at 83 (quoting *McDonnell Douglas*, 411 U.S. at 802). Upon that showing, the burden then shifts back to the plaintiff to "make either a traditional showing of 'pretext'—i.e., that the employer's stated reason was false, and that the sole actual reason was discrimination—*or* a showing that even if the employer's reason is true, discrimination was still a motivating factor in the employment decision." *Bart v. Golub Corp.*, 96 F.4th 566, 573–74 (2d Cir. 2024). To prove an employer's rationale is unworthy of credence, the plaintiff must persuade the fact finder that the reasons are pretextual and used to conceal the true discriminatory intent. *McDonnell Douglas*, 411 U.S. at 792. A plaintiff is not required to show the reasons are false, only that the explanation suffers from "weaknesses, implausibilities, inconsistencies, or contradictions." *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

The City's stated justification for placing the Plaintiff in training was to "develop more command experience before being placed in an acting district chief role." (Def.'s Carter Mem. at 14). Plaintiff responded that this non-discriminatory reason for her assignment to the training program is false and pretext for discrimination (Carter's Mem. at 8.)

Carter offers the following evidence to raise triable issues as to whether there was pretext for discrimination: prior to her removal to the training program, Chief Tenney had already placed Carter on the list of people qualified to be chosen to go in the red car; at the time of the assignment, Carter had already been a Captain for six months and had run more than one thousand calls without incident, with the exception of a situation involving a gas shutoff in a building that no one could locate, and after which the City continued to keep her on the line, without issue; the City's stated purpose for the training was inconsistent with the training Plaintiff received, prompting her to file multiple complaints about the lack of structure and the absence of any written or verbal plan for her; and despite denying purported performance "infractions" as being the reason in the City's Answer to the CHRO complaint, the City also provided shifting explanations as to the basis for requiring Carter to complete the training program—in a letter dated February 23, 2020, Chief Barco indicated that these infractions and other concerns constituted "serious life safety concerns" and were the basis for sending Carter to training. (Pl's 56(a) ¶ 26, 27, 40; Carter's Dep., ECF No. 61-2, at 130:13–130:25;[4] Letter, ECF No. 61-3.)

Considering the entirety of the record, including the aforementioned evidence, Carter has provided evidence that would allow a reasonable jury to find that using her lack of experience as a basis for training was a pretext for discrimination, or at a minimum that her gender was a motivating factor for placing her in the training program.

---

[4] Because the parties provided Carter's complete deposition in four-up format, the Court cites to the actual deposition page numbers, rather than the ECF page numbers.

C.    **Carter's Hostile Workplace Environment Claims under CFEFA And Title VII**

The City next contends that Carter fails to establish a prima facie case concerning her hostile work environment claims. (Def.'s Carter Mem. at 14–19.) The Court concludes that the record contains evidence which creates a triable issue of fact as to whether Carter was subjected to gender-based hostility and harassment in violation of the CFEPA and Title VII.

A plaintiff alleging a hostile workplace environment must demonstrate: "(1) that the workplace was so permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Richardson v. New York State Dep't Correctional Serv.*, 180 F. 3d 426, 436 (2nd Cir. 1999) (cleaned up).

Under the first prong, the court will look to whether the plaintiff has introduced evidence of hostility or harassment that are "sufficiently continuous and concerted in order to be deemed pervasive . . . or that they rendered the workplace so permeated with discriminatory intimidation, ridicule, and insult . . . to thereby alter the conditions of her employment." *Veras v. New York City Dep't of Educ.*, No. 24-CV-1956, 2007 WL 10131754, at *2 (2d Cir. Feb. 6, 2025) (cleaned up). Among the factors to consider when determining whether an environment is sufficiently hostile are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Terry v. Ashcroft*, 336 F.3d 128, 147–48 (2d Cir. 2003).

Where a Plaintiff relies on indirect evidence or facially neutral incidents, she must "offer[] some circumstantial or other basis for inferring that incidents [sex]-neutral on their

face were in fact discriminatory." *Tassy*, 51 F.4th at 533. "Evidence of a general work atmosphere . . .—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." *Banks* 81 F.4th at 262. "The hostility of the work environment as a whole, not the motivation of one decisionmaker, is the central inquiry in a hostile work environment claim, and liability is determined only by looking at all the circumstances." *Id.* (cleaned up).

The record shows that Plaintiff's hostile work environment claims are based on the following alleged conduct, among other more generalized claims:

1. When Carter was a Lieutenant, Driscoll advised her that she needed to lower her tone because she sounded too feminine. (Carter's Dep. at 202:14–22.)

2. When Sheriff was Carter's boss, in his role as Fire Marshal and as Captain, he spent a lot of time unofficially disciplining Carter, often telling her that, she "didn't know what [she] was doing" and that she was "a failure." (*Id.* at 81:17–25.)

3. When Sheriff was not present at an investigation site, he would contact other officers on-site to inquire about Carter's activities and then call her to yell at her while she was on duty. (*Id.* at 88:2–17.)

4. Sheriff, commented to Carter that "You don't want to work this overtime because I know you need to go home and breastfeed your kids." (*Id.* at 203:4–7.)

5. Sheriff would frequently issue frivolous disciplinary write-ups for Carter. (*Id.* at 81:25–82:7.)

6. On April 9, 2019, in response to Carter correcting a co-worker about the email to the Marshalls being addressed to "Sirs" instead of using a term to include the women Fire Marshalls, Mr. Gauvreau responded., "[H]ow about doing your job instead of worrying

about political correctness. Give me a freakin break. And yes [sic] if you don't like my tone then take my ass up to the third floor then. Do your job correctly the first time and maybe we won't have to cover your mess Mam[sic]!!!"  (ECF No 61-5.)

7.  After being told to refrain from using the department email to communicate personal messages and to speak to one of the Chiefs, Gauvreau responded, "Roger that, then we can hash out how everyone feels about the current dead weight." (*Id.*)

8.  When Carter got promoted to Captain, she could hear Sheriff "screaming and laughing and jumping up and down, screaming 'she's f-ing out of here, she finally f-ing out of here.'" (Carter's Dep. at 90:7–21.)

9.  When she was Captain, she was asked who gets on top during sex —referring to the fact her husband was not promoted to supervisor. (Carter Dep. at 205:4–8.) She was also told that she needed to sound like a man for her subordinates to listen to her. (*Id.* at 202:8–16.)

10. After Carter had returned from training, Driscoll came over to Carter while she was putting out a fire and, in front of approximately ten male firefighters from two crews, Driscoll began to scream at her stating she did not know how to do her job. (Carter's Answer Interrogatories, No. 10, par. 1, ECF No. 61-1 at 9.) Another firefighter refused to do in-house station training with Carter and her crew, stating "she [Carter] doesn't know what she's doing she was in training for seven months" and routinely would go around voicing concerns that Carter would kill both her crew and him. (Carter Dep. at 138:20–23.)

Carter's testimony relaying the derogatory comments she was subjected to throughout her career only bolsters her claim and supports a showing of pervasiveness through a pattern

of discriminatory conduct. Carter has presented sufficient evidence to survive summary judgment on her hostile workplace claims, including being denied training afforded to men, passed over for opportunities, subjected to disproportionate criticism and verbal reprimands, and enduring sex-based discriminatory comments. Moreover, a jury may find that the alleged mistreatment Carter claims she was subjected to during her time at the Fire Marshall's Office, including the verbal beratement, excessive monitoring, and frivolous write ups, reflects a broader pattern of differential treatment in which women are more harshly scrutinized and treated unfairly.

Lastly, the incident involving Goog's insubordination and Driscoll's public reprimand could be seen as undermining the Plaintiff's ability to fulfill her job duties and command respect. In *Howley*, the Court found a single incident involving a tirade directed at a female firefighter including "obscene comments" delivered "at length, loudly, and in a group in which [the plaintiff] was the only female" could support the hostile work environment claim as "foment[ed] . . . gender-based skepticism as to the competence of a commanding officer," "diminish[ed] the respect accorded to the officer by subordinates," and "impair[ed] her ability to lead in the life-threatening circumstances often faced by firefighters." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000). While the public reprimand Carter received may not rise to the level of *Howley*, this is not the only instance in which Carter's competence was openly questioned, nor is she solely relying on this instance to demonstrate a hostile workplace environment. (Answer to Interrogatories, No. 10, par. 1, ECF No. 61-1 at 9; Carter's Dep. at 138:21–25.) Viewing the workplace environment as a whole, there is ample evidence in the record of pervasive and long-term sex-based animosity from which a reasonable jury could conclude the workplace was pervaded by discriminatory intimidation, ridicule, and insult.

**D.      Carter's Retaliation Claim under Title VII**

Retaliation claims under federal and state law are analyzed under the burden-shifting framework described in *McDonnell Douglas*, 411 U.S 802–04; *Kwan*, 737 F.3d at 843. To establish a prima facie case of retaliation sufficient to withstand summary judgment, a plaintiff must show "(1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Carr v. N.Y. City Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023). The standard for analyzing the level of harm necessary to be considered materially adverse is that it might have dissuaded a reasonable worker "from making or supporting a charge of discrimination." *Id.* at 179. Unlike hostile work environment and discrimination claims, "a retaliation claim requires satisfying causation and retaliatory-motive elements." *Pardovani v. Miele*, No. 23-CV-834, 2024 WL 2315339, at *2 (2d Cir. May 22, 2024).

While a ten-month gap between a protected activity may not be "prohibitively remote," given that the Second Circuit has "not drawn a bright line to define the outer limits," courts often require additional direct or indirect evidence to establish a connection given such a lapse in time. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009); *Richardson*, 180 F.3d at 447 (describing the types of indirect and direct evidence of a causal connection); *Banks*, 81 F.4th 277 (stating that when there is supporting evidence to demonstrate a causal connection, "the lapse in time between the protected activity and adverse action can be longer").

Carter has failed to present direct or indirect evidence to create a triable issue as to whether a causal connection existed between her complaint of differential treatment and hostile

work environment and her assignment to training. A month following her internal complaint in April 2019, Carter was promoted to Captain, and ten months later, she was assigned to training. Carter has not presented evidence of retaliatory animus or knowledge of the protected activity by the chiefs. And her promotion, along with the ten-month gap, weakens any temporal link needed to establish a causal connection without such evidence. Consequently, the court grants summary judgment to the claim of retaliation, finding that no reasonable jury could find a causal connection exists.

### E.    Constructive Discharge

Finally, the City contends that Carter has failed to establish triable issues as to whether she was constructively discharged. (Def.'s Carter Mem. at 21–22.) Upon consideration of the record, the Court agrees.

Under Title VII, constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. 42 U.S.C.A. § 2000e et seq. While hostile work environment claims require the plaintiff to allege "harassing behavior sufficiently severe or pervasive to alter the conditions of [their] employment," a plaintiff alleging constructive discharge "must make a further showing . . . that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *See Pa. State Police v. Suders*, 542 U.S. 129, 133–34 (2004) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). The plaintiff must also make a second showing of specific intent—i.e., the employer deliberately created an intolerable environment which drove her to resign. *Petrosino v. Bell Atl.*, 385 F.3d 210, 230 (2d Cir. 2004) (noting that a plaintiff must "demonstrate that the employer's actions were deliberate and not merely negligent or ineffective") (internal

quotations omitted).  Consequently, this higher standard has often led this Circuit to allow a claim hostile work environment to survive, while granting summary judgment on a constructive discharge claim. *Id.* (noting that despite finding that defendant's employees and supervisors deliberately made the work environment hostile to women, the plaintiff "endured this environment for eight years"); *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 72 (2d Cir. 2019); *Wilburn v. Fleet Fin. Grp., Inc.*, 170 F. Supp. 2d 219, 238 (D. Conn. 2001).

In considering whether an employer's deliberate actions render an employee's work conditions so intolerable as to compel resignation, the issue is assessed objectively by reference to a reasonable person in the employee's position. *Petrosino*, 385 F.3d at 230. According to Carter's testimony, after completing her training, she returned to her duties as captain, was permitted to ride in the red car, and worked under Cucuta with whom she enjoyed a positive relationship. (Carter's Dep. at 192:23–24, 132:21–25). Carter has not submitted evidence to suggest a material change in these conditions that would compel resignation. Moreover, the record contains no evidence that the City or its employees took any adverse action against Carter after her assignment to training in February 2020. Here, the conditions as described within the record, even viewed in the light most favorable to Carter, are insufficient to meet the "the high standard to establish that she was constructively discharged." *Black v. Buffalo Meat Serv.*, No. 21-1468, 2022 WL 2902693, at *2 (2d Cir. July 22, 2022) (quoting *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 308 (2d Cir. 2017)).

## IV.    <u>CONCLUSION</u>

For the reasons stated above, the City's motion for summary judgment is granted as to Cataldo's claims, as well as Carter's discrimination claim under the CFEPA, retaliation claims under Title VII and the CFEPA, and constructive discharge. The court denies summary

judgment for Carter's discrimination claim under Title VII and hostile workplace environment claims under the CFEPA and Title VII.

**SO ORDERED.**

Hartford, Connecticut
March 26, 2025

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge